**HOUSING AUTHORITY OF the CITY OF NEWARK, a corporation of the State of New Jersey, Petitioner,**

**v.**

**Toby HENRY et al., Defendants.**

**Civ. No. 226–71.**

United States District Court,
D. New Jersey.

Nov. 18, 1971.

Brach, Eichler, Rosenberg & Silver, by William L. Brach, Newark, N. J., for petitioner.

Newark-Essex Joint Law Reform Project, by Michael Sayer, Gerard Clark, and Harris David, Newark, N. J., for defendants.

## MEMORANDUM OPINION

LACEY, District Judge:

 This action was commenced in the Superior Court of New Jersey and was removed to this Court by the defendants, acting pursuant to 28 U.S.C. § 1443 (1), which provides as follows:

> Any of the following civil actions or criminal prosecutions, commenced in a State court may be removed by the defendant to the district court of the United States for the district and division embracing the place wherein it is pending:
>
> (1) Against any person who is denied or cannot enforce in the courts of such State a right under any law providing for the equal civil rights of citizens of the United States, or of all persons within the jurisdiction thereof; * * *.

The plaintiff then moved to remand under 28 U.S.C. § 1447(c): [1]

> (c) If at any time before final judgment it appears that the case was removed improvidently and without jurisdiction, the district court shall remand the case, and may order the pay-

---

1. Plaintiff has indicated a desire to withdraw its motion. The fact that it does so is not significant to this proceeding since we are, of course, dealing with subject matter jurisdiction which cannot be conferred by consent or inaction. *Cf.*

F.R.Civ.P. 12(h) (3): "Whenever it appears by suggestion of the parties *or otherwise* that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." (Emphasis supplied.) *See* pp. 492–493, *infra.*

ment of just costs. A certified copy of the order of remand shall be mailed by its clerk to the clerk of the State court. The State court may thereupon proceed with such case.

The "right" which defendants' Petition for Removal asserts is "denied" or "cannot [be] enforce[d] in the courts" of the State of New Jersey is claimed under 42 U.S.C. § 1981:[2]

§ 1981. Equal rights under the law

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

The § 1981 "right" is generated by the following facts. The plaintiff is a Housing Authority organized under N.J.S. 55:14A–1, et seq. It currently operates various housing projects in the City of Newark. The defendants are representatives of an association of tenants in certain of these projects. In April, 1970, numerous tenants began a so-called rent strike, pursuant to which they ceased to pay any rent. This step was taken to exercise economic leverage against the plaintiff to the end that recognition and suitable response would be forthcoming from the plaintiff of and to the tenants' demands for better living conditions in and about the concerned housing projects.

Negotiations ensued but fell short of substantial accomplishment. The plaintiff then commenced a state court action seeking, among other relief, appointment of a receiver to hold past and future rents pending resolution of the underlying substantive differences. At the same time, the plaintiff obtained from the New Jersey Superior Court a temporary restraining order which, the defendants' Removal Petition states, compelled delivery to a receiver of all rents theretofore collected by the tenants' representatives. The fact is, however, that in subsequent proceedings, by agreement of the parties, it was provided otherwise. There never has been a turnover of rents to a state court receiver, and the defendants have never presented to a state court their objections to the appointment of a receiver. In any event, shortly after commencement of the state action, defendants' Petition was filed. It articulates defendants' § 1981 "right" to engage in a rent strike and to collect but withhold rent money without disclosing its whereabouts. The state court appointment of a receiver, it is argued, "jeopardizes the ability of the tenants to wield any meaningful leverage" in achieving their ends; and it has the further effect, it is contended, "to create a firm prediction that these black tenants are being, and will be, prevented, under color of state law, from leasing or contracting for habitable conditions on the same basis as whites in this society. * * *"

The defendants have the burden of proving "that a federal court, a court of limited jurisdiction, has subject matter jurisdiction, and there is a presumption that a federal court lacks jurisdiction in a particular case until it has been demonstrated that subject matter jurisdiction exists. * * *" [Footnote omitted] Morgan v. Melchar, 442 F.2d 1082, 1085 (3 Cir. 1971).

■ Thus, the generous interpretation accorded a complaint on a motion to dismiss for failure to state a claim [Norwalk Core v. Norwalk Redevelopment Agency, 395 F.2d 920, 925–926 (2 Cir. 1968)] has no application to construction of a Removal Petition. Moreover, as has been stated (F.N. 1, *supra*), this Court can—indeed, must—dismiss cases for lack of subject matter jurisdiction, irrespective of the will of the parties or

---

2. Other bases for § 1443(1) removal were later asserted in defendants' briefs and on oral argument, and will be hereinafter considered. *See* F.N. 6, *infra*.

the practical considerations militating against dismissal. Morgan v. Melchar, *supra,* 442 F.2d at 1085; Berkowitz v. Philadelphia Chewing Gum Corp., 303 F. 2d 585 (3 Cir. 1962); and see Baker v. Riss & Co., 444 F.2d 257, 259 (8 Cir. 1971):

> \* \* \* Neither party has challenged the jurisdiction of the trial court or of this court. On the contrary, both parties assert jurisdiction exists. Subject matter jurisdiction cannot be conferred by consent. Federal courts have only such jurisdiction as is conferred upon them by Congress. It is our duty to satisfy ourselves as to the jurisdiction of the trial court and our own jurisdiction, whether or not the jurisdictional issue is raised.

\* \* \*

We are urged to consider, in examining jurisdiction, that critical questions, of overriding significance, are substantively involved. We are told that the instant matter, if allowed to remain here, can be then consolidated with another controversy, resulting, it is said, in a greater likelihood of peaceful resolution of a frustratingly bitter confrontation. In another context, all this would merit and mandate reflection and consideration. At this procedural stage it is, quite simply, extraneous matter. This Court's jurisdiction is defined by Congress. Ex parte McCardle, 74 U.S. (7 Wall.) 506, 19 L.Ed. 264 (1868); Cary v. Curtis, 44 U.S. (3 How.) 236, 11 L.Ed. 576 (1845); Morgan v. Melchar, *supra,* 442 F.2d at 1085; C. Wright, Federal Courts, § 10. Also, "Jurisdictional questions should be determined as early as possible in a litigation. Underwood v. Maloney, 256 F.2d 334, 340 (3 Cir.), cert. denied, 358 U.S. 864, 79 S.Ct. 93, 3 L.Ed. 2d 97 (1958)." Berkowitz v. Philadelphia Chewing Gum Corp., *supra,* 303 F. 2d at 588. We therefore must resist the temptation of the practical and address the threshold question of whether by law we have the power to entertain this case.

At the outset, a non-issue should be dispelled. We do not deal with that doctrinal dilemma of federal abstention versus federal primacy, a dilemma the horns of which, in this Circuit, are tagged, shaped and pointed by University Day Care Center, Inc. v. Temple University, 442 F.2d 1116 (3 Cir. 1971), and Lewis v. Kugler, 446 F.2d 1343 (3 Cir. 1971), respectively.[3]

3. University Day Care Center, Inc., *supra,* expounding on federal abstention, provides: "Several of these questions, if answered in the negative, would avoid the need for considering the Fourteenth Amendment issues asserted by the plaintiffs. If they are all answered in the affirmative there is no reason to suppose that the Court of Common Pleas will be insensitive to any federal constitutional issues remaining after the state law issues have been resolved. This, then, is a classic case for federal deference to a state forum. *See* Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970); Railroad Commission v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Of particular relevance is the recent decision of the Supreme Court in Askew v. Hargrave, 401 U.S. 476 [478], 91 S.Ct. 856, 28 L.Ed.2d 196 (1971), which reaffirmed the appropriateness of abstention in a case brought under 42 U.S.C. § 1983 where 'state law claims \* \* \* if sustained \* \* \* will obviate the necessity of determining the Fourteenth Amendment question.'" 442 F.2d at 1118.

Further on abstention, see a most recent application by the United States Supreme Court in Hill v. California, 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971), and, referred to therein, Cardinale v. Louisiana, 394 U.S. 437, 89 S.Ct. 1162, 22 L.Ed.2d 398 (1969); Lewis v. Kugler, *supra,* 446 F.2d at 1346: "Federal courts faced with federal constitutional claims should abstain only when there is an unresolved question of state law which only the state courts can authoritatively construe. Abstention in such cases permits state court decisions which may render unnecessary the resolution of constitutional issues, and thereby avoid any possible strain on our system of federalism. \* \* \*" [Footnotes omitted]. *See also* Bond v. Dentzer, 325 F.Supp. 1343 (N.D. N.Y.1971). As for federal primacy, *see* Lewis v. Kugler, *supra,* 446 F.2d at 1346, n. 3, citing the now familiar authorities of Houghton v. Shafer, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968);

The abstention cases, to a degee, illuminate the instant jurisdictional issue, underscoring, as they do, that we live under a federal system, which is largely dependent for its proper functioning upon the states' judicial branch.[4] *See* Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970). *Cf.* Atlantic C.L.R. Co. v. Brotherhood of Locomotive Engineers, 398 U.S. 281, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970). The issue is thus presented: Under all the circumstances, may this matter remain here, or shall it be returned to the state court? Put in less abstract terms, does the underlying but not frequently articulated generating rationale of § 1443(1), a distrust (not shared by this Court) of the

Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967) ; Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967) ; McNeese v. Board of Education, 373 U.S. 668, 671–672, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1962) ; Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), and stating: " * * * This is an action brought under the federal Civil Rights Act, raising federal constitutional claims, and prior resort to the state courts is not required." [Footnote omitted.] For a recent discussion of exhaustion at the state level, as it relates to federal constitutional claims under welfare statutes, *see* Metcalf v. Swank, 444 F.2d 1353 (7 Cir. 1971) ; *see also* Edwards v. Sammons, 437 F.2d 1240 (5 Cir. 1971), a civil rights case, rejecting abstention, and Barrett v. Atlantic Richfield Co., 444 F.2d 38 (5 Cir. 1971), involving Texas statutes on oil and gas leases, which approved abstention, and in doing so, described its origins in Justice Frankfurter's opinion in Railroad Comm'n. of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). *See Note,* Federal Question Abstention: Justice Frankfurter's Doctrine in an Activist Era, 80 Harv.L.Rev. 604 (1967).

4. *See* Younger v. Harris, 401 U.S. 37, 44–45, 91 S.Ct. 746, 750, 27 L.Ed.2d 669 (1971), where the late Mr. Justice Black stated: " * * * This underlying reason for restraining courts of equity from interfering with criminal prosecutions is reinforced by an even more vital consideration, the notion of 'comity,' that is a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways. This, perhaps for lack of a better and clearer way to describe it, is referred to by many as 'Our Federalism' and one familiar with the profound debates that ushered our Federal Constitution into existence is bound to respect those who remain loyal to the ideals and dreams of 'Our Federalism.' The concept does not mean blind deference to 'States' Rights' any more than it means centralization of control over every important issue in our National Government and its courts. The Framers rejected both these courses. What the concept does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States. It should never be forgotten that this slogan, 'Our Federalism,' born in the early struggling days of our Union of States occupies a highly important place in our Nation's history and its future."

*But see* Justice Stewart's concurring opinion in *Younger,* warning against the *Younger* rule being necessarily applicable where "a federal court * * * is asked to intervene in state civil proceedings * * *." (401 U.S. at 55, 91 S.Ct. at 757). *And see* Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971), extending the *Younger* rule of federal restraint to include cases where a declaratory judgment is sought to declare certain state criminal statutes unconstitutional; Boyle v. Landry, 401 U. S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971) ; Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971) ; and Dyson v. Stein, 401 U.S. 200, 91 S.Ct. 769, 27 L.Ed.2d 781 (1971).

As further limiting *Younger, Samuels, Boyle, Perez* and *Dyson, see* Lewis v. Kugler, *supra,* 446 F.2d at 1347: " * * * They are not applicable to situations where no prosecution is pending in state courts at the time a federal proceeding is begun, and they do not alter the abstention doctrine insofar as it relates to federal Civil Rights Act claims which do not seek relief that entails intervention in state criminal proceedings."

States in the civil rights area, direct removal here; or should there be applied the doctrine of restraint, that § 1443(1) is a removal statute and hence to be strictly construed against the right of removal, thus honoring the corollary concept of deference to our federalism?[5]

### The Law

Title 28 U.S.C. § 1443(1) permits removal to the federal district court in both civil and criminal cases commenced in state court against one who "is denied or cannot enforce in the courts of such State a right under any law providing for the equal civil rights * * *."

As was stated by Chief Judge Seitz of this Circuit in Hill v. Commonwealth of Pennsylvania, 439 F.2d 1016, at 1019 (3 Cir. 1971), cert. applied for, 40 U.S. L.W. 3084 (7/16/71):

* * * To justify removal under this section, petitioners must demonstrate that (1) they rely upon a specific civil right stated in terms of racial equality, and (2) a clear prediction can be made that the right relied upon will be denied or not be enforceable in the state court. Georgia v. Rachel, 384 U.S. 780, 86 S.Ct. 1783, 16 L.Ed.2d 925 (1966); City of Greenwood, Miss. v. Peacock, 384 U.S. 808, 86 S.Ct. 1800, 16 L.Ed.2d 944 (1966).

Defendants' Petition clearly meets the first requirement by invoking 42 U.S.C. § 1981.[6] Georgia v. Rachel, 384 U.S.

---

5. No § 1443 case has discussed, though *Boys Markets, infra,* has touched upon, the question of the relationship, if any, between § 1443 and the general removal statute, 28 U.S.C. § 1441. The latter is strictly construed against removal. Shamrock Oil & Gas Corp. v. Sheets, 313 U.S. 100, 108, 61 S.Ct. 868, 85 L.Ed. 1214 (1941); Greater New York Mutual Insurance Co. v. Anchor Construction Co., 326 F.Supp. 245, 247 (E.D.Pa.1971); Proteus Foods & Industries, Inc. v. Nippon Reizo Kabushiki Kaisha, 279 F.Supp. 876, 877 (S.D.N.Y.1967); White v. Baltic Conveyor Co., 209 F.Supp. 716, 718–719 (D.N.J.1962). *See also* Boys Markets Inc. v. Retail Clerks Union, 398 U.S. 235, 247, 90 S.Ct. 1583, 1590, 26 L.Ed.2d 199 (1970): "* * * there is no indication that Congress intended by the removal mechanism to effect a wholesale dislocation in the allocation of judicial business between the state and federal courts. * * *" [There is then cited after the "Cf." signal, City of Greenwood v. Peacock, 384 U.S. 808, 86 S.Ct. 1800, 16 L.Ed.2d 944 (1966).] This view of the restricted nature of § 1441 removal has its direct parallel in the § 1443 removal cases. Those cases hold that removal is an action which is applicable only in "race situations." *Peacock, supra,* at 829, 86 S.Ct. 1800; People of the State of New York v. Davis, 411 F.2d 750, 755 (2 Cir. 1969), cert. denied 396 U.S. 856, 90 S.Ct. 119, 24 L.Ed.2d 105 (1969); · that such removal should not operate "to work a wholesale dislocation of the historic relationship between the state and the federal courts in the administration of the criminal law." *Peacock, supra,* 384 U.S. at 831, 86 S.Ct. at 1814; and a "federal court in a re-

moval case plainly must act with restraint. * * *" Justice Douglas dissenting in *Peacock, supra,* at 854, 86 S. Ct. at 1826.

Thus all signs point to a restrictive rather than an expansive treatment of the removal rights, whether granted by § 1441 or § 1443. For purposes of this opinion we shall ignore any parallels between *those sections* and deal strictly with the judicial treatment accorded § 1443.

*See also* People of the State of New York v. Horelick, 424 F.2d 697 (2 Cir. 1970), cert. denied 398 U.S. 939, 90 S.Ct. 1839, 26 L.Ed.2d 273 (1970); F.N. 1, at 698: "Recognizing the difficulties in applying this venerable but Delphically worded statute but finding it hard to come up with anything better, the American Law Institute has proposed that Congress leave the statute as is, except for repealing the first clause of § 1443(2), which is superfluous, see Peacock, supra, 384 U.S. at 824, 86 S.Ct. 1800, and that federal courts should rely rather on a more liberal use of the injunction in appropriate instances, ALI, Study of the Division of Jurisdiction between State and Federal Courts, 27, 203–06 (1969)."

*Cf.* People of the State of New York v. Galamison, 342 F.2d 255 (2 Cir.), cert. denied 380 U.S. 977, 85 S.Ct. 1342, 14 L.Ed.2d 272 (1965), Concurring opinion Kaufman, J., at 272–273.

6. § 1981 was originally a part of § 1 of the Civil Rights Act of April 9, 1866 (14 Stat. 27), passed over the veto of President Andrew Johnson following ratification of the Thirteenth Amendment. § 3 of the 1866 Act provided for removal of civil or criminal actions started against

780, 86 S.Ct. 1783, 16 L.Ed.2d 925 (1966); City of Greenwood v. Peacock, 384 U.S. 808, 86 S.Ct. 1800, 16 L.Ed.2d 944 (1966); Hill v. Commonwealth of Pennsylvania, *supra*; Young v. I. T. & T. Co., 438 F.2d 757 (3 Cir. 1971); Hackett v. McGuire Bros. Inc., 445 F.2d 442 (3 Cir. 1971).

Defendants' briefs and oral argument advance, in addition to § 1981, other "law[s] providing for * * * equal civil rights" to sustain their removal: 42 U.S.C. § 1982, 42 U.S.C. § 2000d and 42 U.S.C. §§ 3604 and 3617, the latter two sections being a part of the Fair Housing Title (Title VIII) of the Civil Rights Act of 1968, and which in pertinent part read as follows:[7]

§ 3604: * * * [I]t shall be unlawful (b) To discriminate against any person in the terms, conditions, or privileges of * * * rental of a

dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, or national origin.

§ 3617: It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section * * * 3604 * * * of this title. * * *

Dealing first with § 1981, and turning again to *Hill,* we are compelled by reliance thereon to reject the contention in defendants' Petition that they are, under the circumstances of this case, "denied" —or "cannot enforce"—a "right under * * * [§ 1981] in the courts" of the State of New Jersey.[8]

---

persons "who are denied or cannot enforce in the courts or judicial tribunals of the State or locality where they may be any of the rights secured to them by the first section of this act * * *." The reasons for the removal provision are clear. The Joint Resolution submitting to the States the Thirteenth Amendment, abolishing slavery, had barely mustered the requisite ⅔ majority in the House (three changed votes would have lost the measure); and southern resentment toward the Amendment continued to be widespread during the debates on the 1866 Act. *See* Jones v. Alfred H. Mayer Co., 392 U.S. 409, 422–437, 88 S.Ct. 2186, 20 L.Ed.2d 1189; *and see* Justice Harlan's dissent therein, 454–473, 88 S.Ct. 2210–2220; IV Sandburg, Abraham Lincoln, The War Years, 3–14 (1936); Georgia v. Rachel, *supra*, 384 U.S. at 786–792, 86 S.Ct. 1783. § 1443(1) is "a direct descendant" of § 3 of the 1866 Act. Georgia v. Rachel, *supra*, at 786 and 795–796, 86 S.Ct. 1783. *Cf.* Holmes, The Path of the Law, 10 Harv.L.Rev. 465 (1897): " * * * We study the day before yesterday, in order that yesterday may not paralyze today, and today may not paralyze tomorrow." *And see* Holmes, J. in New York Trust Co. v. Eisner, 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963 (1921): " * * * a page of history is worth a volume of logic."

7. § 1982 provides: "All citizens of the United States shall have the same right, in every State and Territory, as is en-

joyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

§ 2000d provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Like § 1981, § 1982 was a part of § 1 of the Civil Rights Act of 1866. § 2000d is a part of the Civil Rights Act of 1964. Both qualify as laws "providing for * * * equal civil rights" under § 1443(1) but will not be dealt with further herein since defendants do not rely on them independently of § 1981 to support removal. There is, however, independent reliance upon §§ 3604 and 3617, thus warranting hereinafter detailed analysis thereof. For a discussion of what is comprehended by "equal civil rights" *see* Georgia v. Rachel, *supra*, 384 U.S. at 792, 86 S.Ct. 1783.

8. Defendants, in their supplemental brief, and on oral argument, expressly abandon their contention that they "cannot enforce" their rights in the courts of the State of New Jersey. They claim only that such rights are "denied" by the very institution of this civil suit against them in the state court. The distinction thus drawn is elusive and obscure. This fragmenting of § 1443(1) is founded upon Justice Douglas' dissent in *Peacock, supra,* 384 U.S. at 840–852, 86 S.Ct. 1800

Since an analysis of *Hill* necessarily requires examination of its underpinnings—*Rachel* and *Peacock*—we shall proceed first to elucidate the ruling principles and directive forces to be drawn from these landmark decisions, both decided on June 20, 1966.

*Peacock* serves our purpose well in this connection: in addition to its own ruling, it examines and distinguishes *Rachel*. Thus in *Peacock* the Supreme Court first reviewed its holding in *Rachel*: that it had there permitted § 1443(1) removal where a state court prosecution "stems exclusively from the petitioners' peaceful exercise of their right to equal accommodation in establishments covered by the Civil Rights Act of 1964 * * * 42 U.S.C. § 2000a et seq. (1964 ed.). * * *" 384 U.S. at 824, 86 S.Ct. at 1811.

*Peacock* then qualified 42 U.S.C. § 1981 as providing the "equal civil rights"

required by § 1443(1), but thereafter distinguished the case before it from *Rachel,* as follows (384 U.S. at 826–827, 86 S.Ct. at 1812):

* * * The present case differs from *Rachel* in two significant respects. First, no federal law confers an absolute right on private citizens— on civil rights advocates, on Negroes, or on anybody else—to obstruct a public street, to contribute to the delinquency of a minor, to drive an automobile without a license, or to bite a policeman. Second, no federal law confers immunity from state prosecution on such charges. [Footnote omitted]

*Peacock* then announced the fundamental principles of a § 1443 removal (384 U.S. at 827–828, 86 S.Ct. at 1812):

* * * It is *not* enough to support removal under § 1443(1) to allege or

It draws no support from the majority opinions in *Peacock* or *Rachel* and is not credited in *Hill*, although concededly not presented to the Court therein. In any event, as will be evident, whether the approach thus taken is or is not well founded makes no difference here. It should be noted, however, that our careful research has unearthed no additional authority for this truncating of § 1443(1) other than Judge Sobeloff's dissent in Baines v. City of Danville, 357 F.2d 756, 778–779 (4 Cir. 1966), aff'd per curiam 384 U.S. 890, 86 S.Ct. 1915, 16 L.Ed.2d 996, upon which Justice Douglas obviously relied, wherein Judge Sobeloff stated that § 1443(1) should be read: "any person who is denied[,] or cannot enforce in the courts of such State[,] * * *."; and not "any person who is denied[,] or cannot enforce[,] in the courts of such State * * *.". Curiously, the first time this removal statute was before the United States Supreme Court [as § 641 of the Revised Statutes of the United States (1878)], it received careless editing. While in actuality its critical clauses were as bare of commas as in § 1443, § 641 appears in Strauder v. West Virginia, 100 U.S. 303, 311, 25 L.Ed. 664 (1879), as "denied, or cannot enforce, * * *". Just a few pages away, in Virginia v. Rives, 100 U.S. 313, 317, 25 L.Ed. 667, the same Justice, Strong, wrote that § 641 provided for removal "when any civil suit or prosecution is commenced

in any State court for any cause whatsoever, against any person who is denied or cannot enforce * * *". In the same opinion, at page 321, however, he wrote: " * * * that act gives the right of removal only to a person 'who is denied, or cannot enforce, in the judicial tribunals of the State * * *'". Quite clearly Justice Strong's punctuational aberrations are revelatory of his own understanding (in 1879) that the removal statute, § 641 [now § 1443(1)], was not to be read as Justice Douglas, Judge Sobeloff, and defendants' counsel would have it read. *See* Revised Statutes of the United States (1878); Statutes at Large of the United States for 1866 and 1870. There is nothing in the legislative history of § 1443 which would support the Douglas-Sobeloff view. *See Peacock*, 384 U.S. at 834–835, 86 S.Ct. at 1816: " * * * Fully aware of the established meaning the removal statute had been given by a consistent series of decisions in this Court, Congress in 1964 declined to act on proposals to amend the law. All that Congress did was to make remand orders appealable, and thus invite a contemporary judicial consideration of the meaning of the unchanged provisions of 28 U.S.C. § 1443. * * *" It is not suggested that what was to be the Douglas-Sobeloff view was presented to Congress in 1964. It is suggested it was never thought of in view of the earlier holdings such as *Strauder* and *Rives*.

show that the defendant's federal equal civil rights have been illegally and corruptly denied by state administrative officials in advance of trial, that the charges against the defendant are false, or that the defendant is unable to obtain a fair trial in a particular state court. The motives of the officers bringing the charges may be corrupt, but that does not show that the state trial court will find the defendant guilty if he is innocent, or that in any other manner the defendant will be "denied or cannot enforce in the courts" of the State any right under a federal law providing for equal civil rights. The civil rights removal statute does not require and does not permit the judges of the federal courts to put their brethren of the state judiciary on trial. Under § 1443(1), the vindication of the defendant's federal rights is left to the state courts except in the rare situations where it can be clearly predicted by reason of the operation of a pervasive and explicit state or federal law that those rights will inevitably be denied by the very act of bringing the defendant to trial in the state court. * * * [Emphasis in the original].

Accordingly, notwithstanding the petitioners' allegations in *Peacock* of what the Supreme Court called "an outrageous denial of their federal rights," removal was denied.

Now considering *Hill*, there the defendant-petitioners were charged in state court with assault and battery, unlawful assembly, and inciting to riot. They alleged in their removal petitions that their arrests and the charges against them were based upon conduct supportive of an attempt by the Black Construction Coalition to secure equal employment opportunities in the City of Pittsburgh; that this was conduct having as its purpose the securing of federally protected equal civil rights; and that Pennsylvania was denying them these rights—and rendering them unenforceable—by the prosecutions. They then argued that

"since they are immune from prosecution, any proceeding in the state court will necessarily deny them their rights protected by this immunity. * * * *" (439 F.2d at 1019). Chief Judge Seitz, in ordering remand, first analyzed *Rachel* and *Peacock* (439 F.2d at 1021) :

The statutes relied upon in *Rachel* necessarily displaced any state laws which would proscribe the act of remaining in public accommodations when asked to leave on account of race by prohibiting attempted punishment for this act. However, when statutes, such as those relied upon in *Peacock*, grant one a right not to be intimidated for efforts to accomplish a particular goal or while asserting a specific right, we cannot ascribe to Congress an intent to displace state laws which regulate one's conduct while attempting to exercise the right unless, of course, the federal right permits specific acts which are proscribed by state law, or the state law, in effect, forecloses a reasonable possibility of engaging in acts necessary to assert the federal right. Without a displacement of state law we do not have a situation in which a federal right is substituted for a state crime; therefore the mere pendency of a prosecution based on state criminal laws does not provide the necessary basis to firmly predict that a federal right would be denied in state court.

As *Hill* points out, *Peacock* lacked "the distinguishing feature of *Rachel*, the statutory substitution of a right for a crime." Put another way, the federal law relied upon for § 1443 removal "did not * * * displace the state laws under which the petitioners were charged." (439 F.2d at 1021). Applying these guideposts to the case before it, *Hill* held that the federal statute [18 U.S.C. § 245(b)] relied upon by the defendant-petitioners "was not intended to displace the ordered functioning of state legal processes, whatever the motivation of those instituting the prosecution. * * * "9

---

9. Defendant-petitioners contended their activities could not be prosecuted because

they were specifically protected by 18 U.S.C. § 245(b) which in pertinent part

■ The persistent and pervasive theme of *Rachel, Peacock* and *Hill* is plain: § 1443(1) removal requires that there be two clearly antithetical policies represented on the one hand by the "equal civil rights" federal statute and, on the other, by the state statute being applied (or, as in *Rachel,* by the state proceeding complained of). It must appear that what is being done, or attempted at the state level, is forbidden or prohibited by any reasonable construction of the federal statute relied upon.

Thus, in *Rachel,* in reliance on a specific right, expressly granted, the petitioners were in a place of public accommodation. Absent otherwise unlawful conduct (*e. g.,* destruction of property, fighting, etc.), they could not be prosecuted for being in that place of public accommodation.

In *Peacock* there was, under the statute relied upon, a general right to aid in voter registration. There was not, however, a specific right granted to use any activity to accomplish that end.

■ Finally, under *Rachel* and *Peacock,* as analyzed by *Hill,* the test in determining a § 1443(1) removal is whether the specific activity pursued by a petitioner was specifically authorized by Congress, in order to accomplish the particular civil right conferred by the "equal civil rights" statute which a petitioner relies upon.

■ To thus state the question is to render inevitable the ruling that the defendants' Petition, in relying upon § 1981, fails to sustain removal: § 1981 does not authorize a rent strike; indeed, landlord-tenant relationships are not expressly covered in that statute.

■ Independently of § 1981, in their supplemental brief and on oral argument, defendants argue that §§ 3604(b) and 3617 are also "law[s] providing for * * * equal civil rights" which sustain removal under § 1443(1). Assuming but not deciding that the Removal Petition may be thus enlarged, it is clear that these provisions are laws providing "equal civil rights." People of State of New York v. Davis, 411 F.2d 750, 753 (2 Cir. 1969), cert. denied 396 U.S. 856, 90 S.Ct. 119, 24 L.Ed.2d 105 (1969).[10] The former statute, § 3604(b),

provides criminal penalties for: "(b) Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with—* * * (5) any citizen because he is or has been, or in order to intimidate such citizen or any other citizen from lawfully aiding or encouraging other persons to participate, without discrimination on account of race, color, religion or national origin, in any of the benefits or activities described in subparagraphs (1) (A) through (1) (E) or subparagraphs (2) (A) through (2) (F), or participating lawfully in speech or peaceful assembly opposing any denial of the opportunity to so participate— * * *"; and (b) (2) (C) protects one who is "applying for or enjoying employment, or any prerequisite thereof, by any private employer or any agency of any State or subdivision thereof, or joining or using the services or advantages of any labor organization, hiring hall, or employment agency; * * *."

10. In *Davis* the defendant was prosecuted in state court for "menacing" a state welfare officer in violation of New York's Penal Laws. In his Removal Petition defendant denied the charge, and said the prosecution was racially motivated and thus, by its very institution, denied him his rights under §§ 3604(b) and 3617, in that it coerced, interfered with, and intimidated him (§ 3617) while he was engaged in exercising his rights under § 3604 to enjoy housing free of discrimination. While finding §§ 3604 and 3617 were "equal civil rights" laws under § 1443(1), the Court stated (411 F.2d at 753): "While the argument has evident force, there is the distinction that in *Rachel* the conduct charged as a criminal offense, to wit, not leaving the restaurants on request, was alleged by the defendants to be the very activity in which the Civil Rights Act gave them a right to engage, namely, enjoyment of equal access to places of public accommodation. A true parallel under the Fair Housing Act would be, for example, if Davis were being prosecuted under a

makes it unlawful to discriminate in the sale or rental of housing covered by the statute "because of race, color, religion, or national origin." The latter statute, § 3617, makes it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise of enjoyment of or on account of his having exercised or enjoyed" any right granted by § 3604. Defendants argue that their rent strike is a right protected by § 3604(b) and that the institution of the action by N.H.A. in the state courts was racially motivated; was an act within § 3617; interfered with the rent strike; and was a coercive activity which would result in breaking the rent strike.

They further contend that, following institution of the action, the application by the plaintiff below for appointment of a receiver, which was granted, effectively operated to "break the back" of the rent strike.

Examining these contentions, under *Hill* the test must be whether the specific activity in question was authorized by Congress to promote the "equal civil rights" of § 3604 and did such act of Congress preclude state control of the activity? Rent strikes are not sanctioned by 42 U.S.C. § 3604, and the general nature and broad scope of the statute cannot be said to preclude all state regulation of the landlord-tenant relationship. Moreover, even assuming that a rent strike had been specifically permitted by Congress, the appointment of a receiver would hardly constitute coercion, intimidation, a threat to, or interference with, the rent strike. The receiver was to collect and hold, under the state court's direction, the withheld rents until the settlement of the underlying dispute, but was not to turn the funds over to the plaintiff. The relevance of these considerations is undeniable and their cumulative effect unanswerable. The case therefore, must be remanded, and, as in *Hill*, the application for a hearing on the petition's allegations is denied.

The defendants' subtly ingenious effort fails to distinguish *Hill* from the case at bar. That *Hill* was a criminal and not, as this, a civil action, is of no

statute forbidding tenancy by persons not approved by a majority of the dwellers in an apartment house and the removal petition alleged that the basis for disapproval was Davis' being a party to a mixed marriage. In such an instance, on the facts claimed by the defendant, § 804 [§ 3604] of the Fair Housing Act would have substituted a federal right to occupy the apartment for what the state had branded as a crime. In contrast the Fair Housing Act confers no right to menace or assault anyone, including persons who have allegedly demonstrated hostility to its purposes."

The Court held that § 1443(1) did not allow removal under the circumstances. *Cf.* People of the State of New York v. Horelick, 424 F.2d 697, 702 (2 Cir. 1970), cert. denied 398 U.S. 939, 90 S.Ct. 1839, 26 L.Ed.2d 273 (1970). The legislative history of the Fair Housing Title of the Civil Rights Act of 1968 affords no assistance on the removal question. This Title was essentially ignored in the Committee reports. 2 U.S.Code Congressional and Administrative News at p. 1837 (1968, vol. 2); *and see* Congressional Record, vol. 114, no. 17, p. S–983 (sponsor's summary of proposed legislation); pp. S–984–94 (remarks of Senators Mondale and Brooke); no. 18, pp. S–1055–56 (remarks of Senator Tydings); no. 19,

pp. S–1184–90 (remarks of Senators Javits, Hart and Kennedy); no. 36, p. S–2309 (colloquy between Senators Mondale and Allott); no. 61, p. H–2774 (remarks of Representative Rumsfeld); p. H–2784 (remarks of Representative Murphy). While Congress must have been cognizant of § 1443 removals in view of its consideration of that provision in the 1964 Civil Rights Act, and the problems raised by the prior decisions in *Rachel* and *Peacock*, there is no reference in the legislative history as to when removal would be appropriate under the 1968 Act. It must, however, be assumed that Congress intended that the principles of *Rachel* and *Peacock* would apply to a removal action under the Fair Housing Act as to any other "equal civil rights" legislation. For a recent decision dealing with a claim of alleged discrimination under the Fair Housing Title, *see* Trafficante v. Metropolitan Life Ins. Co., 446 F.2d 1158 (9 Cir. 1971). This case suggests that it is not enough to state a claim thereunder to allege a general pattern of racial discrimination and maintenance of a ghetto pattern. To this extent, defendants in the case at bar have also fallen short of an allegation of a violation of this Act. However, for present purposes we shall continue to assume the Act was sufficiently invoked, as under *Davis*.

moment; for § 1443(1) draws no distinction between these two categories in establishing removal criteria.[11]

11. For a recent civil case involving a § 1443(1) removal, *see* Thompson v. Brown et al., 434 F.2d 1092 (5 Cir. 1970), where defendants sought to have removed an "election contest" commenced against them, three black candidates, by three white candidates they had defeated in the election. The Court here clearly indicates that the test for civil case removal is like that for criminal case removal.
Defendants urge upon us Whatley v. City of Vidalia, 399 F.2d 521 (5 Cir. 1968), as determinative of the case at bar. To the extent it differs from *Hill* we may not follow it. Chief Judge Seitz in *Hill* was expressly aware of *Whatley*. (439 F.2d at 1020).
Three very recent Third Circuit cases on § 1443 removal are Commonwealth of Pennsylvania ex rel. Gittman v. Gittman, 451 F.2d 155 (3 Cir. 1971); Commonwealth of Pennsylvania v. Meyers, et al., 449 F.2d 787 (3 Cir. 1971); Pennsylvania ex rel. Rothenberg (Beers) v. Beers, 450 F.2d 783 (3 Cir. 1971). None bears on the critical issues of this case.

12. It is regrettable that removal should have been attempted here. The New Jersey state courts are in the forefront in vindicating and establishing civil rights. More to the point, New Jersey courts are second to none in abandoning time-worn, anachronistic and ill-serving doctrines, where they have outlived their utility, in favor of fluid and dynamic concepts of liberty and equality. In the very field involved, landlord-tenant relationships, this has been demonstrated, and demonstrated so clearly that defendants here ultimately abandoned herein their claim that their civil rights could not be enforced in the New Jersey state courts. Thus, the rent strike concept has been approved in New Jersey by Marini v. Ireland, 56 N.J. 130, 265 A.2d 526 (1970), which not only imposed upon landlords an implied covenant to maintain premises in habitable condition, but made this covenant mutually dependent with the tenant's covenant to pay rent. Moreover, *Marini* holds that where a landlord, following due notice, fails to make necessary repairs, the tenant may do so, using rent money therefor. *See also* Morrocco v. Felton, 112 N.J.Super. 226, 270 A.2d 739 (Law Div. Essex Co. 1970); Berzito v. Gambino, 114 N.J.Super. 124, 274 A. 2d 865 (Union Co.Dist.Ct.1971); Academy Spires, Inc. v. Brown, 111 N.J.Super. 477, 268 A.2d 556 (Essex Co.Dist.Ct. 1970).

Accordingly, the motion to remand is granted. An appropriate order should be promptly submitted.[12]

*See also* Chapter 224 of the Laws of 1971, enlarging tenants' rights, signed into law by Governor Cahill on June 21, 1971: "An Act promoting safe and sanitary housing for tenants of substandard dwellings and supplementing Chapter 42 of Title 2A of the New Jersey Statutes." The findings of the Legislature on this enactment are as follows:
Be It Enacted by the Senate and General Assembly of the State of New Jersey:
1. The Legislature finds:
a. Many citizens of the State of New Jersey are required to reside in dwelling units which fail to meet minimum standards of safety and sanitation;
b. It is essential to the health, safety and general welfare of the people of the State that owners of substandard dwelling units be encouraged to provide safe and sanitary housing accommodations for the public to whom such accommodations are offered;
c. It is necessary, in order to insure the improvement of substandard dwelling units, to authorize the tenants dwelling therein to deposit their rents with a court appointed administrator until such dwelling units satisfy minimum standards of safety and sanitation. N.J.S.A. 2A:42–85 to 97.

In the face of this broad perception of the legislative, executive and judicial philosophy thus revealed, it would be reckless to indulge the facile assumption that the defendants' rights would be unenforceable in the state courts of New Jersey. Accordingly, there is no foundation at all for the apprehension that the weapon of the rent strike, with the alleged economic power it possesses, is going to be blunted, bent, or wrested from the defendants by the New Jersey courts. It follows that it cannot be plausibly maintained that defendants' rights to utilize the rent strike are unenforceable in the New Jersey state courts. Our own experience as lawyer and judge teaches us otherwise.
*See* Domeracki v. Humble Oil and Refining Co., 443 F.2d 1245, 1251 (3 Cir. 1971): " * * * what we know as men, we should not ignore as judges. * * *"; People of the State of New York v. Galamison, et al., 342 F.2d 255, 272 (2 Cir.), cert. denied 380 U.S. 977, 85 S.Ct. 1342, 14 L.Ed.2d 272 (1965): "Judges are not 'forbidden to know as judges what [they] see as men.' Ho Ah Kow v. Nunan, 5 Sawy. 552, 560 Fed. Cas.No. 6,546 (1879). * * *"