**Doris McCRAY et al., Plaintiffs,**

v.

**Pearl BEATTY et al., Defendants,**

v.

**STELLA WRIGHT TENANTS' ASSOCIATION et al., Third-Party Defendants.**

**LOCAL 305 OF the SERVICE EMPLOYEES INTERNATIONAL UNION, AFL–CIO, Plaintiff,**

v.

**The HOUSING AUTHORITY OF the CITY OF NEWARK, a body corporate and politic and James Lynn, Secretary of the United States Department of Housing and Urban Development, Defendants.**

**Civ. A. Nos. 74–413, 74–439.**

United States District Court,
D. New Jersey.

July 17, 1974.

Essex-Newark Legal Services Project by Harris David, J. Michael Callan, Newark, N.J., for Doris McCray and others.

Franzblau, Cohen & Falkin by Gary L. Falkin, Newark, N.J., for Local 305.

Edward G. D'Alessandro, East Orange, N.J., Ferdinand J. Biunno, Newark, N.J., by Michael Lombardi, East Orange, N.J., Emil W. Nardachone, Belleville, N.J., for defendants NHA.

Jonathan L. Goldstein, U. S. Atty., by Z. Lance Samay, George E. Mittelholzer, Asst. U. S. Attys., Newark, N.J., for defendants HUD.

## OPINION

LACEY, District Judge.

In this, a class action, the parties seek judicial approval of their compromise settlement as required by F.R.Civ.P. 23(e). For reasons hereinafter set forth, the settlement is approved.*

### Nature of the Action

The named plaintiffs herein, by complaint and amended complaint, filed respectively on March 22 and 29, 1974, seek to enjoin defendant Newark Housing Authority (NHA) from halting services at, and closing the NHA-owned and operated low income housing project known as Stella Wright Homes (SWH)

---

* Local 305, etc. v. The Housing Authority of the City of Newark, et al., Civ. 74–439, is deemed consolidated for all purposes with the class action, Civ. 74–413, but is not considered hereinafter in this Opinion.

wherein plaintiffs are tenants. Other defendants are United States Department of Housing and Urban Development (HUD), its Secretary, and individual members of the Board of Commissioners of NHA.

In their complex pleadings plaintiffs assert causes of action, and jurisdictional bases, founded upon (1) alleged violations of First, Fifth and Fourteenth Amendment rights under the United States Constitution; (2) the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (42 U.S.C. Sections 4601 et seq.); (3) the United States Housing Act of 1937, as amended (42 U.S.C. Sections 1401 et seq.), and the Annual Contributions Contract between HUD and NHA; (4) The National Environmental Policy Act of 1969 (42 U.S.C. Sections 4321 et seq.); (5) state relocation laws and various other state statutes; (6) applicable state and federal regulations; and (7) 42 U.S.C. Sections 1981, 1982 and 2000d.

Class Action status was afforded by order of this Court, the class, as represented by the named plaintiffs, comprising all SWH tenants; and, pursuant to further order of this Court, the requisite notice was transmitted to all members of the class. See Tr. April 3, 1974, at 15; Tr. April 5, 1974, at 27. Conferring of class action status was, it should be noted, with defendants' consent.

### Other Proceedings

Upon commencement of their suit, plaintiffs moved for a temporary restraining order. Following hearing on March 25, 1974, their application was continued to allow additional briefing; and on April 2, 1974, after further argument, NHA was enjoined from closing SWH until further order of the Court, NHA being directed as well to afford plaintiffs immediately a Due Process hearing designed to test NHA's avowed reason for being compelled to close SWH, to wit, its virtually bankrupt status, aggravated by the four-year old rent strike by the SWH tenants.

Thereafter, on numerous occasions, further proceedings, formal and informal, were conducted (see, e.g., Tr. April 2, 5, and 22; May 1, 15, 16, 28; June 3, 1974), relating to settling the form of the injunction order, the notices to plaintiffs, the nature of the Due Process hearing, and resolving on short notice, because of the emergent nature of this matter, disputes between the parties over discovery of documents and depositions of NHA personnel. Of particular significance was the hearing on June 3, 1974. It was at this time that the Court indicated to counsel that it was seriously considering the imposition upon plaintiffs of a requirement that they pay their utility charges pending resolution of the Due Process issue and as a condition to the Court's continuing the restraint. Immediately thereafter both sides announced a willingness and readiness to enter into settlement discussions under the Court's aegis, a course the Court not only welcomed but had earlier pointedly suggested. See Tr. April 2, 1974, at 38–45; 72, et seq.

Meetings then were held, first with only counsel participating, but subsequently with the principals involved as well, joined by third parties whose mediation, conciliation, wisdom, and good will aided greatly in dissolving the bitterness, bad feeling, and distrust engendered by the four years of misunderstanding that have marked the longest rent strike in our nation's history.

Finally, at a conference called by the Court, counsel in late June submitted a draft proposal of settlement which, with minor revisions, the Court found acceptable, subject of course to the approval by the SWH tenant-plaintiffs comprising the designated class. At this conference, and again on July 3, 1974, the Court reviewed with plaintiffs' counsel, in fulfillment of its obligation under Rule 23(e), the tenant notice and approval the Court required as prerequi-

sites to its approval of the compromise settlement.

On July 16, 1974, all counsel appeared and presented to the Court the final form of agreement and, as well, substantial evidence in affidavit form which, the Court finds, establishes that all of the members of the plaintiff class were given written notice of the settlement agreement, were afforded the opportunity to consult with counsel and members of the SWH Tenant Association as to the meaning of the agreement and its impact upon the individual tenants, and were informed that they had the right to object to the settlement if they so desired. None chose to do so. In a word, the Court conceives that all the class members approve the settlement. The documentation substantiating this, to which I have referred, will of course be incorporated in the record of this proceeding. *Cf.* Greenfield v. Villager Industries, Inc., 483 F.2d 824 (3d Cir. 1973).

### The Settlement

*Applicable Class Action Approval Law*

F.R.Civ.P. 23(e) provides:

A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

■ It is of course clear and settled doctrine that a Rule 23(e) determination is committed to the sound discretion of this Court. As stated by Chief Judge Seitz for the Court of Appeals of this Circuit in Ace Heating & Plumbing Company, Inc. v. Crane Company, 453 F.2d 30, 34 (1971):

Great weight is accorded his [i. e. the trial judge's] views because he is exposed to the litigants, and their strategies, positions and proofs. He is aware of the expense and possible legal bars to success. Simply stated, he is on the firing line and can evaluate

the action accordingly. We consider appellants' objections against this legal background.

*See also* Kohn v. American Metal Climax, Inc., 458 F.2d 255 (3d Cir.), *cert. denied,* 409 U.S. 874, 93 S.Ct. 120, 34 L. Ed.2d 126 (1972); City of Detroit v. Grinnell Corp., 495 F.2d 448 (2d Cir. 1974); State of West Virginia v. Chas. Pfizer & Co., 440 F.2d 1079, 1085 (2d Cir.), *cert. denied sub nom.* Cotler Drugs, Inc. v. Chas. Pfizer & Co., 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971); 3B Moore's Federal Practice Para. 23.80[4]; 7A Wright & Miller, Federal Practice and Procedure, Sec. 1797.

■ Generally, compromise of any litigation is encouraged. Moreover, a court must not substitute its own judgment for that of the parties; however, a court cannot and this Court would not approve a settlement that appeared inequitable or unfair to any party to the suit.

What is the "scope of review"—what are the parameters—for the judicial function in the subject context? The standard is well stated in the following excerpt of an opinion by now Chief Judge Brown of the Fifth Circuit in Florida Trailer and Equipment Co. v. Deal, 284 F.2d 567, 571 (1960):

Of course, the approval of a proposed settlement does not depend on establishing as a matter of legal certainty that the subject claim or counterclaim is or is not worthless or valuable. The probable outcome in the event of litigation, the relative advantages and disadvantages are, of course, relevant factors for evaluation. But the very uncertainties of outcome in litigation, as well as the avoidance of wasteful litigation and expense, lay behind the Congressional infusion of a power to compromise. This is a recognition of the policy of the law generally to encourage settlements. This could hardly be achieved if the test on hearing for approval meant establish-

ing success or failure to a certainty. Parties would be hesitant to explore the likelihood of settlement apprehensive as they would then be that the application for approval would necessarily result in a judicial determination that there was no escape from liability or no hope of recovery and hence no basis for a compromise.

Additional judicial gloss is imparted by the Court's statement in State of West Virginia v. Chas. Pfizer & Co., *supra*, 440 F.2d at 1086:

It is important to take particular note of the fact that in reviewing the compromise, this court need not and should not reach any dispositive conclusions on the admittedly unsettled legal issues which the case raises, yet at the same time we are apparently required to attempt to arrive at some evaluation of the points of law on which the settlement is based. . . .

In City of Detroit v. Grinnell Corp., *supra*, 495 F.2d at 456, the Court stated:

. . . It cannot be overemphasized that neither the trial court in approving the settlement nor this Court in reviewing that approval have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute. . . .

■ On the other hand the proposed settlement cannot be judged "without reference to the strength of plaintiffs' claims." *Id.* at 456. "The most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement." State of West Virginia v. Chas. Pfizer & Co., *supra*, 440 F.2d at 1085.

Guided by these principles, the proposed compromise must now be examined.

*The Agreement*

To understand and evaluate the proposed agreement, it is necessary to consider the underlying dispute, its genesis, and its history.

NHA is a Housing Authority organized under the Local Housing Authorities Law, N.J.S.A. 55:14A-1 et seq. It owns and operates, with the aid of HUD (pursuant to the United States Housing Act of 1937, 42 U.S.C. Sections 1401 et seq.), twenty-three housing projects in the City of Newark, inhabited by approximately 37,000 people (or almost 10% of the City's total population). NHA has not been spared the agonizing fiscal crisis facing local public housing agencies nationally. *E. g.*, Fletcher v. Housing Authority of Louisville, 491 F. 2d 793 (6th Cir. 1974); Barber v. White, 351 F.Supp. 1091 (D.Conn.1972). *See* Pozen, *The Financing of Local Housing Authorities: A Contract Approach*, 82 Yale L.J. 1208, 1216–17 (1973). Indeed, it is not hyperbole to state that NHA is on the brink of bankruptcy.

The SWH project consists of seven 13-story buildings upon a 14-acre site in Newark's Central Ward, and was opened for occupancy in December 1959. It contains 1206 residential units, with a full tenant population of approximately 4000 people. Presently it is only about half occupied.

The instant controversy is not an isolated problem of a single low income housing project in an inner city location. It is, however, one which has been exacerbated by a crippling and unprecedented rent strike which, over four years, has resulted in tenants withholding several million dollars of rents from their landlord, NHA. Until now the circle has not been effectively broken: NHA, short of funds, is unable to fulfill the legislative commitment of the United States Housing Act of 1937 to provide to all that which is basic to human dignity, "decent, safe, and sanitary dwellings. . ." 42 U.S.C.A. Sec. 1401. As their quality of life deteriorated, the tenants on April 1, 1970 commenced their rent strike. Whatever efficacy this device has in the private sector, it failed miser-

ably here. NHA, with only rents and federal subsidy to provide income, was thus deprived of substantial sums and thereby compelled to reduce services and maintenance still more, as it struggled to avoid financial collapse. Indeed, there came a time when the rent strike was indulged in by 30% of the NHA tenants, concentrated primarily in three of its high-rise complexes, SWH, Columbus Homes and Scudder Homes (which house approximately 4000 families, or 15,000 persons). As of February 1974 NHA's rent receivables equalled more than $6.5 million due to withheld rents.

NHA did not sit idly by. It brought suit against the SWH tenants' representatives in the New Jersey Superior Court after the rent strike was under way for about a year, and sought appointment of a receiver. Defendants removed the suit to this Court under 28 U.S.C. Sec. 1443(1), but this Court remanded the matter. Housing Authority of City of Newark v. Henry, 334 F. Supp. 490 (D.N.J. 1971). Subsequent litigation of this matter proved largely ineffectual, certain of the tenants' representatives were adjudged in contempt of court, and the situation overall deteriorated.

From time to time the parties' representatives met to resolve their differences. Indeed, on at least two occasions agreements were seemingly reached; but for one reason or another were aborted.

While at issue upon many things, the SWH tenants and NHA were in accord on one proposition: that the underlying ills of tenants' refusal to pay rent and NHA's inability to provide habitable housing were curable only by the medicine of HUD millions.

Even before the commencement of the rent strike the SWH tenants, represented by the Stella Wright Tenants' Association (SWTA), recognized the key role of HUD in enabling them to obtain improved living conditions. In September 1969 SWTA met with HUD officials to discuss their grievances with respect to deteriorated living conditions at Stella Wright. After the commencement of the April 1, 1970 rent strike, continued meetings with HUD were sought but with little success. Subsequently HUD instructed NHA to commence the aforementioned suit for appointment of a receiver, and to obtain an accounting of all moneys withheld by the striking tenants and to have such moneys put within the jurisdiction of the Court.

HUD, on its part, has not been parsimonious in dispensing public funds to NHA. Many millions of HUD dollars have poured into NHA's projects over the years. Yet, just as it has not been enough in other urban areas, it has been insufficient in Newark. Importuned to supply even more money, HUD has, from time to time said, not unreasonably, that once the tenants and NHA resolved the rent strike, it would consider additional relief.

In the spring of 1971 serious negotiations occurred between SWTA and NHA. In the course of these negotiations it was made clear by NHA that any proposals requiring monetary expenditure would require HUD approval. At HUD's suggestions, NHA and SWTA developed joint proposals for security and reduction of population density (depopulation) at the project. These proposals, however, were rejected by HUD, which in turn suggested a pilot project for depopulation of one building. HUD's pilot plan was apparently found unacceptable to the tenants. Further negotiations resulted in a SWTA–NHA agreement permitting tenants to collect rents and decide, in part, how they were to be spent. Again, however, the requisite HUD approval was not obtained.

In July 1971 HUD formally entered negotiations at which time an offer of $550,000 was made to settle the strike. This offer was not acceptable to the tenants. Subsequent meetings were held with HUD, culminating in the April

1972 meeting in Washington between SWTA and HUD officials. These meetings failed to result in any breakthrough and subsequently HUD resumed a less visible presence.

Even when matters seemed to be at their nadir, the situation was aggravated when eviction proceedings, commenced by NHA against certain SWH tenants for non-payment of rent, terminated with a judicial determination that the SWH living conditions were such as to warrant an 80% rent abatement. A brief description of these events is appropriate.

During the period from December, 1972 to March 1973, NHA commenced approximately 2450 dispossess actions against rent-striking tenants, of which approximately 500 involved SWH tenants. On April 3, 1973, as a result of an agreement reached between various tenant groups (including representatives of SWH) and NHA, all 2450 dispossess actions were dismissed without prejudice to NHA moving for reinstatement if the settlement proved unsuccessful.

The agreement reached declared that high-rise low income housing in the City of Newark had proven "unsuccessful, unmanageable, and not in the best interests of the tenants, the community and the City itself." It recognized "the serious deterioration of living conditions" and the need to develop alternate housing. It called for increased and improved security for the projects, for increased tenant participation, and for a joint evaluation of defects and conditions needing repair, and steps for their correction. The tenants agreed to pay rents for the months of April and May 1973, to be deposited in a special NHA-Tenant account to be applied toward repairs in the respective projects. A 60-day evaluation and progress report was then to be prepared.

It is claimed by NHA that this agreement was not honored by the tenants. In any event, in October 1973 NHA reinstated 21 of the original 2450 dispossess actions, all of the 21 involving SWH tenants.

Prior to the reinstatement of these actions, in August 1973, the Division of Inspections of the Newark Department of Health and Welfare conducted an inspection of the NHA buildings and 56 percent of the apartments at Stella Wright and found nearly 4000 violations of the Newark Housing Code. The Director of the Division of Inspection concluded that the SWH project was uninhabitable and a health hazard and recommended that the city consider condemning the project as "unfit for human habitation" although noting the lack of available facilities to relocate its tenants.

The dispossess actions proceeded before Hon. Joseph F. Walsh, Presiding Judge, Essex County District Court, and were defended on a claimed breach of the implied warranty of habitability. Judge Walsh found the Stella Wright project to be uninhabitable, denied the evictions sought, and granted the tenants an 80 percent abatement of past and future rents due as a result of conditions in the project. Housing Authority of the City of Newark v. Aikens, No. T–291932 (Essex County Dist. Court November 27, 1973).

Subsequent to Judge Walsh's decision, further meetings were held between the NHA, tenants and HUD. Then, by letter to HUD, dated January 10, 1974, NHA requested immediate additional federal funding to avert the total collapse of services to all of its projects. This letter noted that without the requested funds NHA would have no alternative but to announce immediately the closing of Stella Wright, with the very distinct possibility of also closing Columbus Homes and Scudder Homes. HUD's reply, dated January 21, 1974, indicated that Newark had received "its fair share" of assistance and that the requested funds would not be made available.

On February 4, 1974 the Commissioners of NHA passed a resolution calling for the "phase out" of SWH, beginning immediately, and calling for a formal closing of the project no later than April 15, 1974. Rent-paying families were to be moved into existing vacancies in other projects, while non-rent-paying families were only to be offered referrals to vacancies in non-public housing. The resolution cited NHA's negative cash balance, making it unable to operate its total housing program; its failure to obtain additional funds from HUD, the State of New Jersey and the City of Newark; and its inability to continue to maintain Stella Wright as a result of a 75 percent withholding of rents creating a deficit in excess of $800,000 per year which had to be drained off other projects.

An examination of the minutes of the February 4, 1974 meeting of the Commissioners of NHA reveals the following: (1) that the closing of SWH will not solve the NHA's fiscal problems; (2) shortly, the NHA may be required to also close Scudder and Columbus Homes; (3) closing of all three projects would not solve the NHA's fiscal crises; (4) the NHA did not have sufficient vacant housing to relocate the rent paying tenants of SWH, let alone the non-rent payers; (5) and that while great dislocation was to occur, no affirmative plan had been offered on what was to become of the Stella Wright project once it was closed.

All parties agree that the NHA is "on the brink of bankruptcy" (April 1, 1974 affidavit of James P. Sweeney, Area Director of the Newark, New Jersey Area Office of HUD). NHA's operating deficit for the fiscal year, running from April 1, 1974 to March 31, 1975, is projected at $12,804,120. It also has an unfunded operating deficit of approximately $2.6 million carried forward from fiscal 1973. Applying the HUD formula for the amount of operating subsidy to which it is entitled from HUD, NHA has requested $8,111,420, leaving it approximately 4.7 million short of its projected deficit for fiscal 1974 alone.

The Court is faced with what until now has been a problem impossible of solution. Given NHA's desperate financial plight, and the continuation of a rent strike, it is my analysis that Columbus Homes and Scudder Homes must also be closed in the near future.

While the operation of Stella Wright results in the diversion of $800,000 from other projects, the operation of Columbus Homes results in a diversion of $1.2 million. Columbus Homes, with a greater number of units than Stella Wright (1556) but upon a similar sized site, also has been recently declared uninhabitable as a result of dispossess actions.[1] Scudder Homes, with an average rent collection of 62 percent, compared with the 43 percent at Stella Wright, still results in a diversion of $800,000 from other projects. A closing of these three projects would result in the displacement of as many as 4300 families.

Since commencement of these proceedings four months ago, NHA has relocated certain SWH tenants in other housing projects, though plaintiffs claim the latter are in no better condition than SWH. Yet NHA, as to the several hundred remaining SWH tenants, states it has no relocation obligation and states further that it has no available shelter for these tenants in any event.

Subsequent to the NHA decision to close down SWH, the president of SWTA announced that due to the lack of

1. Housing Authority of the City of Newark v. Feliciano, (Essex County Dist. Court April 10, 1974) (Harth, J). In his finding of uninhabitability Judge Harth concluded that the concept of high rise apartments for low income families with children must be seriously questioned. He granted a rent abatement varying from 45 percent to 60 percent.

available relocation facilities, those who remained in SWH after the proposed cessation of services would attempt to operate the project themselves. Some tenants began contributing their rent to a tenants' fund in an attempt to accumulate sufficient moneys to continue services after NHA withdrawal. Others, however, did leave SWH, but as of April 2, 1974, 648 families remained.

Exploring HUD's position on the proposed closing of Stella Wright, it agrees that NHA is on the "brink of bankruptcy" and that HUD occupies a role of providing financial and general supervisory assistance to NHA, yet it has denied NHA the funds needed to avert the closing of Stella Wright and possibly future projects, including Scudder and Columbus. It has previously expended substantial amounts at Stella Wright and now considers the decision to close Stella Wright as within the proper scope of the NHA's local authority since it is "faced with financial disaster [threatening] the entire public housing system in Newark.' (Sweeney affidavits 4/1/74 and 4/17/74). HUD concludes that the closing of Stella Wright was not in "disregard of NHA's duty to provide decent low cost housing," but necessary "to preserve public housing in Newark."

The closing down of SWH would be intolerable. Such action may ameliorate NHA's fiscal problems; yet it would greatly reduce the number of public dwellings available in the City of Newark, without any corresponding plans to restore or replace them, and would cause disastrous dislocation of families who apparently cannot be accommodated elsewhere. On the other hand, NHA cannot exist as a going entity much longer if the rent strike continues and is allowed to spread; and, whether the rent strikers are or are not warranted in the action they have taken, the fact is that other tenants who are paying rent to NHA are subsidizing those who are not.

Given this deplorable tale, it is readily apparent that this is a case involving complex fact issues, crying for the kind of solution the parties now tender to this Court for its approval.

*Plaintiffs' Case*

Even were this Court to permit the preliminary injunction to continue until resolution of the Due Process issue, it would have been conditioned upon plaintiffs' payment of at least their share of the utility charges, but not in excess of Brooke Amendment levels. To do less would be inequitable.

Moreover, even if the plaintiffs were to prevail upon final hearing, with the Court thus enjoining the closing down of SWH, this Court, again, in an exercise of its broad equity powers, and considering the public interest involved, would have fashioned a decree which required plaintiffs to terminate their rent strike. *See* Virginia R. Co. v. System Federal No. 40, 300 U.S. 515, 552, 57 S. Ct. 592, 81 L.Ed. 789 (1937). Rents would have been required; and in the face of continued non-payment, I would not have required NHA, in its straitened circumstances, to maintain SWH any longer. Indeed, this Court has already permitted NHA to substantially reduce its staff.

The best aspect of the proposed settlement, from the point of view of plaintiffs and NHA, is, given termination of the rent strike, HUD is prepared to allocate substantial sums to remedy conditions at SWH and at other NHA projects.

HUD's position in this litigation is a difficult one to assess. Plaintiffs' Amended Complaint asserts against HUD certain claims based upon novel theories. This Court has already indicated, in its oral opinion on April 2, 1974, its assessment of the merits of these claims. No more than this need be said: even if plaintiffs were to prevail in their legal position as to HUD,

there is no way, within the parameters of this lawsuit, that this Court could require HUD to do what it is prepared to do if this settlement is approved and plaintiffs live up to their obligations under it.

Overall, therefore, plaintiffs' suit at best, from their point of view, is only a holding action, offering no hope of a lasting solution and, indeed, quite predictably, having the result of SWH deteriorating more and more until the tenants have brick and mortar, but little else, for shelter.

*Analysis of the Agreement*

Considering the weakness, legally and practically, of plaintiffs' case, one is struck with the generous terms offered plaintiffs in the settlement. First of all, SWH will not be closed down. Next, the tenants will be given a voice in its operations. Moreover, consideration is given to the fact that impecunious tenants may at times fall behind in their rent; and deferral thereof is provided. Should a tenant's apartment be such that it is deemed in need of substantial repair, that tenant's rent will be paid to a joint committee of tenants and NHA representatives and used by it to remedy the deficiency.

Moreover, back rents need be paid only from February 1, 1973 forward, and even as to these, tenants are given forty-eight months to discharge this indebtedness.

NHA, aided by substantial sums from HUD, will be required to increase its services and, hopefully, working with tenant representatives, will be able to install long range solutions which will preclude in the future the bitter actions and reactions which have marked the last four years of the SWH–NHA relationship.

Under all the circumstances, therefore, this Court finds the proposed settlement a fair one, particularly insofar as the tenants are concerned, and accordingly, approves it pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

In the light of the foregoing, I am causing to be entered appropriate orders of dismissal for not only this suit, but for the other suits to be dismissed under the terms of the agreement of settlement. All dismissals are without costs, and without attorneys' fees.

The foregoing opinion is intended to satisfy the requirements of F.R.Civ.P. 52 relating to findings of fact and conclusions of law.

As an epilogue to this opinion, it should be said that today is a momentous day for the City of Newark. We conclude this day the longest, most crippling rent strike in the history of this country. That, in itself, is a monumental accomplishment. Indeed, even this Court felt at times that it was impossible of achievement. But our action today has even greater significance than this.

This agreement, by the residents of Stella Wright, the Newark Housing Authority, the City of Newark, and the Department of Housing and Urban Development, bears the stamp of dedicated commitment by all to combine with one another and to work together, in a spirit of understanding and cooperation, so that the noble and lofty goal of the United States Housing Act of 1937 of decent, safe, and sanitary homes to families of low income, becomes a reality.

That commitment is embodied in the agreement submitted to me by the parties for judicial approval and entry as an order of this Court. Having directed counsel to submit copies and explanations of this order to each member of the class of plaintiffs, and to all parties, for their consent and approval; and having been satisfied by the representations of counsel for plaintiffs and accompanying affidavits that that was done, and that there are no objections to the entry of this order, I have approved the agreement of the parties and it will be entered as an order of this Court.

It was clear to me from the outset of the rent strike, and even more so upon the filing of the lawsuits which ultimately brought us here today, that any real and lasting solution to the agonizing problems with which all of you have had to contend for the past four years, could only come through the kind of action which you have so wisely decided upon.

In an effort to come to terms with the many complex and tormenting problems of low-income housing in this city, each of you—the plaintiffs, the Housing Authority, HUD and the City of Newark—has given much. You have worked zealously, under great pressure (some of which this Court has applied), and around the clock. You are all to be commended. Additionally, I would like to compliment and pay tribute to Mr. Gustav Henningburg for his efforts in aiding the Court and counsel in this matter. His quiet competence, the respect he enjoys in this community, and his concern, made him an invaluable catalyst in the settlement discussion.

Particular note should be taken of the important role played by counsel in the achievement of this settlement. It was, after all, through their efforts that this settlement was brought about. I express my appreciation to Messrs. David and Callan; Messrs. Biunno, D'Alessandro & Nardachone; and to Mr. Kohn, representing Mayor Gibson and the City of Newark. Special praise I reserve for United States Attorney Jonathan L. Goldstein and Assistant United States Attorney Z. Lance Samay, whom I regard as the architect of this settlement. Under Mr. Goldstein's direction, Mr. Samay was able to orchestrate, in the span of a few short months, the resolution of problems which have plagued this City for the past four years.

Although this action marks the conclusion of this litigation, and the end of the rent strike at Stella Wright, it is, as I have already mentioned, only a beginning. Much hard work yet remains to be done. The success of this undertaking depends upon the perseverance and good faith of the parties to it. History is made by this unprecedented agreement, but it is not self-executing. Stella Wright can be a model for others to follow; it can symbolize, to the entire Country, what can be achieved by good will and mutual trust.

The problems of public housing in this city, as elsewhere, are not readily solved. Certainly their resolution is not found in the drastic measures pursued these past four years. Indeed, the rent strike concept applied to public low-income housing has vastly different consequences from a rent strike in the private sector, where parties, dealing at arms length, exchange items of equal value. In the public low-income housing context, the very nature of the relationship between landlord and tenant presupposes that the tenant will receive premises of greater value than that which he can afford to pay. The Brooke Amendment fortifies this proposition. The landlord does not profit from such a relationship. However, assuming that the tenant pays his rents, the Housing Authority landlord can, with the aid of such rents, and governmental subsidies, its only sources of revenue, continue to operate. Given such a situation, a tenant's refusal to pay rent because such premises fall into disrepair makes little sense. If anything, it serves only to make the problem more acute. The "successful" rent strike then sees tenants paying no rent —but having their project deteriorate until there is nothing to do but close it down.

This is the lesson of Stella Wright. It is a bitter lesson which was hard-learned, but one from which we can well benefit. The concept of the rent strike in low-income public housing requires reexamination. The Court does not perceive it as a viable method under such circumstances.